Good morning. May it please the Court, Brian Walter, appearing for the City of Los Angeles. The central issue in this appeal... I hear we're getting a new fire chief. Yes, that's correct. The central issue in the appeal is whether there is some sort of subgroup of firefighters who are involved in responding to, involved in fighting a fire, but nonetheless do not satisfy the FLSA test for engaging in fire protection activities. And there's two different types of firefighters that we're going to be talking about today. Firefighters who are assigned as dispatchers, and firefighters who are assigned to the air ambulance or the air helicopter, the helicopters essentially that the fire department has. Can I ask a question with regard to the dispatchers? Is there a third category of dispatcher, I'll call them civilian dispatchers, that are neither trained firefighters nor trained paramedics who work on a 40-hour work week as opposed to the 24-hour platoon shifts that the firefighters and paramedic dispatchers work on? To my knowledge, Your Honor, not at this time. The only two types of dispatchers that the city currently has are either firefighters or in some cases a few single-function paramedics who don't have all of the firefighting training. So you don't have what I'll call pure civilian dispatchers that didn't go, either didn't go through the fire academy nor have they received advanced life support training? No, Your Honor. Okay. It goes right from 911 right to the fire department. Correct, Your Honor. There might be, I believe there are some calls that first go into CHP or other police agencies and when they realize they're fired, they can send over fire or emergency response. Or if it's emergency response in an ambulance, they just push a button. It goes right to the emergency response, doesn't it, to the firefighters? Well, Your Honor, if you're talking about what the dispatchers are doing, it's a little more complicated than that. The dispatchers … Well, if you've got someone that needs help, sometimes you've got to get there within four minutes or they die. So they have a quick system. Maybe it wasn't quick enough. Anyway, doesn't this Cleveland versus the City of Los Angeles have some control over this case? Well, Cleveland is relevant, but it doesn't control the case, Your Honor. That's my case. I appreciate that. But I think there is a little bit of a distinction. I mean, I was the writing judge. That's my case. It belongs to the country. He is but the oracle. I'm just the instrument. Well, I think the distinction between this case and Cleveland is the issue in Cleveland was whether certain firefighters had responsibility to engage in fire suppression when they were assigned to ambulances. And the key there was the word, really, responsibility. The whole Cleveland decision focuses on what does responsibility mean? Well, so, so then that pretty much put aeromedical techs, perhaps the dispatchers, into that same group with the paramedics. Well, I don't think so, Your Honor, because the issue that we're dealing with here is whether or not the activities that they are indisputably doing and indisputably responsible for are fire suppression or fire protection activities or something else. That's not covered. Whereas in the Cleveland case, there wasn't a dispute in that case that if a firefighter was on an ambulance responding to a heart attack call, that that's a medical response, not a fire response. Are the mechanics who maintain the firefighting equipment, the trucks, engaged in fire protection activities? They could be if they're trained firefighters and certified. If they meet the other tests in 203Y, in other words, they have the training, they're actual sworn firefighters, they're part of the fire department. I think they could be. I don't know offhand how to define this. Is that the next lawsuit? What's that? Is that the next lawsuit? Potentially. I don't know. But in regards to the dispatchers in this case, the Cleveland decision, for example, talked about if there's a fire, the plaintiffs in that case, it must be their job to deal with it. In this case, if there's a fire, it is the dispatcher's job to deal with it. If they don't deal with it, the fire doesn't get it back. They're not out there holding the hose and all that. Correct. But the district court's decision presumes that there should be an on-scene requirement to qualify for fire protection activities under the FLSA. Our position is that there's a lot more that goes into firefighting than just the person who's standing out, you know, at the fire inside the house holding the hose, including the people who are laying the hose, which the district court also didn't seem to think was firefighting. You filed fairly extensive stipulated facts before the district court. Are you now arguing that this is an issue that should be tried to a jury because it's inherently fact-intensive? Or do you still agree that it's properly resolved on summary judgment? No, I agree it's properly resolved.  I think the dispute is how do you interpret those facts and apply them to law in this situation? And really, how do you define it? The argument you were just making is, I guess, what I would call a but-for causation argument. But for the fact that it's the dispatcher who answers the 911 call, codes in the type of call that it is, the computer-aided dispatch, then identifies what equipment needs to be sent to that call. No one would ever go to the scene of the call and resolve what the issue is. And therefore, they must be engaged in fire suppression activities when they do that. That is the argument that we've made in our briefs and I'm making now. I think that's a reasonable inference to draw from the stipulated facts, which state that they handle all of those 911 calls. So can we draw any conclusion from the fact that Congress never mentions the word dispatcher when it puts in all the other job functions of a firefighter, like conducting building inspections and all the other things that are listed in the statute? Well, Your Honor, the statute lists, it just lists different job types. It mentions firefighters, paramedics, EMTs, and so forth. It doesn't say anything about building inspection, really. It talks about prevention, control, and extinguishment of fires or response to emergency situations where life property or the environment is at risk. And when you use the phrase either engage in fire suppression, which is in Y1, Y subdivision 1, or engage in the prevention, control, and extinguishment of fires, which is in Y2, that both of those go beyond just the person who is putting the water on the fire and is standing there and is, you know, can feel and see the fire. There's a lot of other moving parts to that process to get that fire out. And dispatchers are the first part of that, but they are a critical key part of that. You know, responsibility to engage in fire suppression. So you think someone telephones somewhere in a dispatch office that has a responsibility to engage in fire suppression? Yes, we do assert that because when the call comes in to that dispatcher, as we noted in our facts, that dispatcher is going to assign resources to the fire and is going to make a lot of decisions on whether to send additional resources or monitoring the firefighters when they're actually inside buildings. They have little transmitters that they can monitor in case something goes wrong. They are monitoring the whole incident. They're doing a lot of the high-level management and oversight in conjunction with the incident commander. They're not really actively engaged in putting out fires, are they? I would disagree. If you're saying are they physically on the scene putting out the fire, no. No. But are they part of the process that is necessary to put out the fires? I think they are. Counsel, let me ask you if I may. The dispatchers work out of the operations control division. I understand it's located four levels below City Hall in downtown Los Angeles. They work 24-hour shifts, correct? That's correct. Why? Why do they work 24-hour shifts? Because all of the firefighters, or not all, but most of the firefighters in the fire department are scheduled on a 24-hour, this ABC schedule that repeats every 27 days. I understand that firefighters that are in stations and that go out to fire scenes, I understand, I think, why it's a good idea to schedule them in 24-hour shifts. Why is it a good idea to have the dispatchers that work four levels below City Hall also scheduled in 24-hour shifts? Well, let me, one of the things we talk about in the stipulated facts is they're not working all 24 hours. They work an hour or two on, then they have an hour or two off, hour or two on, hour or two off, for that whole 24 hours. And they can even leave the building. Well, you want them right there. Well, you also want them to get some rest and be. Well, they sleep there. Right. And it's a difficult job, so you don't want someone, they don't want the dispatchers sitting there for hours at a time unless it's a critical, major emergency event. Yeah, but they sleep it right there. They can leave, up to five dispatchers per shift can leave, actually walk outside of City Hall as long as they stay. No, no, no, I'm talking about the fire, the guys in the fire stations, the ones that, you know, set the hoses. Yeah, I think we understand, at least I think I understand, why the firefighters in the stations have the shifts they do, and I understand the policies behind that. What I don't understand is why the dispatchers four levels below City Hall in downtown Los Angeles are organized the same way. Well, there's something called surge capacity, and that would be activated, for example, there was a train crash a few years ago involving Metrolink where they activated their surge capacity, and for a major brush fire, a major incident. And having those people on a 24-hour shift in the building, close to the building, but not actually working, in other words, it allows them to have twice as many dispatchers. Half of them are on, half of them are off every hour or two. And so the reason they do that is if there's a major incident, they call them all back, and they say, okay, wake up everyone, you know, or stop your meal break. We're going to get all, I believe about 26 dispatchers per shift. And so instead of having 13 on, we're going to pull all 26 in and have them working at the same time. And how often has that happened in the past 10 years? You know, it's in the stipulated facts. I believe it's on average about once a month, but I know it's addressed in our stipulated facts. And so you're saying if you did it the way many other communication centers do it around the state, with eight-hour shifts, you wouldn't have that surge capacity, because you wouldn't have people waiting in the wings as you do here. That's correct, Your Honor. And, you know, in regards to, we've talked about the dispatchers, and I'm quickly running out of time here. In regards to the air ambulance personnel that work on the air ambulance, when you talk about fire suppression, they are actually responsible for the hoses that are, they actually put hoses into a helicopter, get in the helicopter, fly to a remote location. But I thought the testimony was that that's less than 5% of the time. Basically what they're doing is they're manning an air ambulance, 95% of which is devoted to non-firefighting activities. That's correct. Well, there's a job description that mentions that is 5% of the time. There's also a stipulated fact that indicates 81% of all the calls that come to the city are medical as well. So that percentage is not that surprising when you consider that would apply citywide to the entire department. And the thing about 203Y is it doesn't have, the case law in it is pretty clear that 203Y eliminated this 20% rule, meaning there isn't a specific amount of time someone has to spend engaging in firefighting as long as they have that responsibility. And for the air ambulance personnel, if there is a brush fire, a structure fire, a major fire, they absolutely have that responsibility to go to that location and be a really critical part of the helicopters that do the water drops and also that map the fires. On the willfulness issue, my understanding is that the city never wrote to or inquired from the Department of Labor about dispatchers or the air ambulance technicians. Is that right? That's correct. And so what does that tell us about the willfulness issue post-Cleveland? Well, I don't think it says much about willfulness. I think that goes more to the good faith issue because the good faith defense does require you to do that. The good faith defense, to assert it, requires you to look at the specific issue. We don't believe that the willfulness standard that plaintiffs have to prove requires the city to specifically have looked at the issue. In fact, the Supreme Court's, in Thurston and in the McLaughlin case, said that willfulness is not negligence. It's something more. It has to be something more than negligence. Well, it's ignoring a known risk. And isn't there a known risk after Cleveland? There's a known risk for firefighters who work on rescue ambulances, absolutely. And the city did go and meet with the DOL, and that's in our stipulated facts. So Cleveland wouldn't give you any risk at all, any concerns at all about dispatchers or the air ambulance technicians? Well, I think they're totally different types of jobs. I mean, the city's fire department is one of the largest fire departments in the United States, and there's, you know, the example of mechanics was raised earlier. There's probably a lot of other sort of isolated jobs firefighters are performing, and there's no case that requires the city to go out and audit every single firefighter position because it lost some other decision involving other types of employees. So we would dispute. And it really would almost eliminate the purpose of willfulness to say, for good faith, you have to look at the specific issue. For willfulness, you also have to look at the specific issue. The district court, I thought, rejected that argument, saying that that's the burden of the employer. The employer has to decide whether it's in compliance with the Fair Labor Standards Act. Well, the district court did that. That's not the correct standard for willfulness. The employees have the burden of proving willfulness in that situation,  Could you address the last issue with regard to the credit for overtime that was paid versus what the plaintiffs are seeking here? As I understand it, the city offered basically, what, four different ways the district court could compute that amount? Yes. The city paid all of the firefighters in this case overtime every 27 days based on the hours they worked over 204 hours in that 27-day period. And in going back and retroactively computing overtime over 40-hour work weeks, the city sought to get a credit for all of that overtime it had already paid. And the district court rejected that, saying that the city only gets that credit in the individual work week when that amount was paid and for the hours that could be allocated to that overtime. And when you're talking about when the city thought it had a 27-day cycle, if you could have a firefighter work the first nine days in the 27-day cycle, they would be getting overtime, FLSA overtime, and the city would get no credit for that at all. Well, under the city's calculation, using the 264 hours in the 27-day period, the overtime, it had about 60 hours of overtime. Is that right? Correct. Yes. And under Judge Marshall's order, if you did the calculation, that would come to 128 hours of overtime. If you applied liquidated damages to that amount? No, if you just applied her calculation. Well, it wouldn't come to exactly 120 because the city would get some credit for some of those 60 hours towards the overtime that was owed. I believe in the example we used, the city would get credit for 20 of the 60 hours in that example in our brief. So 40 of the hours of overtime the city paid would essentially go by the wayside, and the city would still owe 40 additional hours of overtime to those firefighters in our example. And that's because the district court did a work week by work week instead of looking accumulatively over a larger time frame. Well, that's where people get paid by the week, right? Well, they get paid usually by the pay period. The pay period, yes. Yes, and even a pay period would have been more equitable than the work week by work week. So as I understand, she awarded, what, back wages, liquidated damages of double that amount, and then credit only on a 40-hour work week basis? Yes, she awarded a credit based on whether the overtime the city paid for that 27-day cycle could be allocated to the 40-hour work week in which the 27-day cycle ended. In other words, when that 27-day cycle ends, the firefighter would have been paid, in the example we used here, 60 hours for the hours over 204 in the 27 days. And what she did is she took those 60 hours and applied them to each hour worked going backwards. In other words, so you would look at, okay, did the firefighter work the shift the day before, three days before, and then say all 24 of those hours were paid at an overtime basis. All 24 of the next were paid at an overtime basis. But for that, and allocate the overtime hours that way, but a lot of those hours in those were in 40-hour work weeks under 40 hours. In other words, so the city ends up the way this was, and it's a counting nightmare, but the way it's allocated, the city ends up paying, having that time in half credited to regular hours under the 40 hours in a week for that week and the week before. And so the overtime hours that Judge Marshall calculated based on working over 40 hours in a week, there would be some credit for some of those, but then the first 40 hours in the week paid at an overtime basis, the city loses that credit essentially. The city intended to pay for all the FOSA overtime hours, and the city came up short if those firefighters should have been paid after 40 instead of after. And what's the total dollar difference between what the district court ordered by computing it that way versus what the city thinks it owes? I don't have those numbers offhand, Your Honor. The calculations, I will say, are very complicated. Can you give us a ballpark order of magnitude? I'm trying to figure out whether this is just grossly unfair to the city or whether because of the fact that the court found that the city engaged in a willful violation of the Fair Labor Standards Act, that's the price you pay for your willful misconduct. You know, I don't have the numbers offhand. I believe it's around a 30 to 40 percent reduction in damages if the offsets are, if the city's given full credit for that, but I can't assure you that's the correct number. All right. Thank you. May it please the Court. Tom Woodley on behalf of the plaintiff, appellee, dispatchers, and the air ambulance technicians. With the permission of the Court, I'm going to focus my allotted ten minutes or one-half of our time on the questions of liability, liquidated damages, and the third year of recovering the unlawfully withheld overtime pay. And, again, with the Court's permission, the balance of our remaining ten minutes will be Mr. Kauffman focusing on the set-off or credit issues. With regard to liability, we clearly think, as we pointed out in our brief, that this matter is controlled by this Court's Cleveland decision back in 2005. And if you go through the six or seven elements or factors in the Cleveland holding, all of those are in favor of our position and the district court judge, Marshall, rule correctly on the stipulated record entering summary judgment in favor. She was in both of the cases. I'm sorry, Judge? She was in the Cleveland case. She was. She was the district court judge that decided that Cleveland in 2002, and, again, this Court affirmed her decision in 2005. Reharing and Bonk was denied by the Ninth Circuit in Cleveland, and the city filed a petition for cert, and that was rejected by the Supreme Court. There's one factor that I didn't see explicitly mentioned in Cleveland, and let me ask you if it should be considered, and that is the need to have 24-hour shifts or the like in order to effectively engage in fire protection activities. Should that be considered? And if so, what do you have to say about the city's position here that they really do need 24-hour shifts for the surge capacity needs in order to effectively deal with and engage in fire protection? Well, the shift schedule of individual employees is not a controlling consideration under the statutory language or under the Labor Department's regulations. It's almost irrelevant, the number of hours, whether there are firefighters engaged with the responsibility to engage in fire suppression, which is, again, the statutory language. And they do work 24-7 with three platoon shifts, and the dispatchers have to be there around the clock as well. But, again, the number of hours is not a significant consideration under the statutory language or under the Labor Department's regulations. It's really the responsibility. Right. But one of the key responsibilities, are they engaged in fire protection activities? And so my question really is, if you really need 24-hour shifts or something like that for surge capacity for fire protection, isn't that some evidence that what they're doing is engaging in fire protection activities? Well, the key statutory test is fire suppression, as Cleveland decided. It's what the firefighters say, putting the wet stuff on the hot stuff. It's putting out, it's quelling fires. And the paramedics in Cleveland did not do that. In fact, the paramedics, if one thinks about this, were actually closer to fire suppression, because they did respond to fires. They responded to perform their medical care. They didn't throw water or ventilate roofs or rescue people out of abandoned buildings. So the paramedics actually went to fire scenes. Here with our dispatchers, they're four stories below in City Hall. They're just answering incoming 911 calls. But the city does have, I think, a fair point, maybe but-for-causation is the best way to describe it, that without those services, there would be no fire suppression, because no one would come. Well, that can be also said of the mechanics maintaining the equipment. If they don't have the trucks up and running- Well, I didn't hear him say that the mechanics weren't covered, so- Clearly, the mechanics are not- I mean, the driver engineer certainly is, if he's standing there operating the pumps. But I don't think-and he has to bring the rig to the scene of the fire, but- Well, once again, mechanics are not engaged in fire suppression, and that is the test, as Cleveland pointed out. And as the statute clearly says, it has to be engaged- But, I mean, does suppression include more than physically putting the wet stuff on the hot stuff? Can it include a determination of how many resources we're going to send and what type of equipment we're going to send and how many personnel we need to respond to this type of incident? Now, I realize a lot of that is done in a pre-coded manner, so that it's the computer who essentially decides all that once the dispatcher codes the call, but- Well, again, I think we hearken back to the Cleveland holding with the paramedics. Certainly, everyone would agree they have an important role to play within the fire department. In fact, over 80 percent of the calls coming to the fire department are medical emergencies. So they had an important role, but we know what the outcome was  They did not quell the fires, and that's what really fire suppression means. That's the dictionary definition, which was referenced in Cleveland. What does fire suppression mean? It means quelling, putting out- But don't dispatchers play a more significant role in quelling or putting out fires than paramedics? No, I would say no. They're equally important. I think paramedics play a very significant role in providing emergency medical care. Dispatchers have a significant role responding to incoming calls and dispatching different units. First of all, just to clarify, obviously I believe paramedics play a critically important role in society. But my point is, who plays a closer role, more closely connected to fire suppression, putting out the fire? Isn't that the dispatchers? Not necessarily. I mean, I think the mechanics. You asked that question. The mechanics have an essential role. If the trucks aren't running and maintained, there's not going to be quelling of fires. Even the secretaries that work within the fire department do the payroll clips. What about the role of the dispatcher in monitoring the individual firefighter alarm, so that if a building ceiling collapses on the firefighter in the middle of the fire and his alarm is activated, the dispatcher will be able to alert that we've got a fireman down and we need to rescue him? If a captain that's in charge of a fire scene calls back to the dispatching office saying we had a major catastrophe, we need a greater response and additional safety. That's not my question, counsel. As I understood what your opponent said, one of the duties of the dispatcher is to monitor while the firemen are quelling the fire for the safety of that firefighter, because they all have individual alarms. That is part of their responsibility. So they're the ones who decide whether or not to send in a rescue team if we have a fireman down. But, again, I guess I would come back to fire suppression. That is the controlling statutory language. As a matter of fact, the dispatchers... So would you say that the fire department, when it sends a safety officer to the scene of a major fire, whose job it is to basically stand there and make sure that the firemen are acting in a safe manner and are not entering the building when it is unsafe to do so, is not engaged in fire suppression activities? He's not quelling the fire. It's, again, the Cleveland case. I'm guessing the city would take a different view of that. They would respectfully disagree with me, by all means. But, yeah, it really comes down to quelling the fire, and that's what Cleveland held, and that is clearly controlling precedent. So how about the guy who operates the air truck that brings more Scott Airpaks, and is he involved in quelling the fire or no? The air ambulance technician... No, no, no. I'm talking about the guy who brings the oxygen tanks to the scene of the fire, and when the firefighter runs out of air and they come out for a fresh tank, he gives it to them. Is he involved in fire suppression activities? Being involved in the helicopter? No, no, no, no. The guy who drives the red and white equipment truck that arrives at the scene of the fire with fresh oxygen tanks. He's a maintenance employee. He's not a firefighter. So he's not involved in suppressing the fire. He's not throwing the wet stuff on the red stuff. Well, if that's the test, then I guess we're going to have to eliminate everybody, but the guy who's holding the hose, I guess it wouldn't include the guy who raises the ladder, because he's not suppressing the fire. He's not putting the wet stuff on the fire. It's a pretty restrictive position you're taking. That's Cleveland, and it was correctly decided, and that's the position of the Labor Department. Well, the guy that puts the ladder up can also go in and hold the hose. It's strange for that, isn't it? Well, of course, the dispatchers don't go to the fires. They're four stories below just responding to calls and dispatching units. They have nothing to do with fire suppression whatsoever, and they're further removed from the fire scene, and even the paramedics, as I said, who occasionally would respond to fire scenes to do medical care, but they'd be at the fire on standby notice if someone was hurt, and that was perhaps a closer call to fire suppression. The paramedics in Cleveland and these dispatchers were just in front of their desk jobs. They don't go outside, and they don't fight the fires. They don't carry SCBAs. They don't have fire protective equipment. All of these stipulated facts are set forth in our record. We just look to the common meaning of the word. I'm sorry, Judge? We look to the common meaning of the word. Yeah, fire suppression. It's the responsibility to engage in fire suppression. And as one of you judges noted, the dispatcher position is not even listed in 203Y. They have paramedics listed there that can conceivably be covered under the fire protection exemption. The dispatchers are not even mentioned. And 203Y2 is in the conjunctive. I think Mr. Walter may have misspoke when he used or. It's 203Y1 and 2 are in the conjunctive. It says and, so it has to satisfy all of those tests, and they don't get beyond the burden of being engaged in fire suppression. But they are trained in fire suppression, right, the dispatchers? They are. Almost all of them are cross-trained. Why? Because that's a policy of the fire department. They want to have some training in their background so they can probably be more effective dispatchers when they have that cross-training in the background. But they don't engage in continuous cross-training, and they're not at the fire stations. They're not going out with the apparatus. They don't have SDAs. They don't have protective gear. They don't do rescues. So I take it your position must be, I'm looking at 203Y2, is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where fire, life, property, or the environment is at risk. You would say they're not involved in response to emergency situations. That's correct. They are not responding. They have to physically respond. That's what's called a first responder, is they respond to the scene of the emergency, whether it's a fire or a motor vehicle accident or a rescue situation. First responders mean you go, you respond, and you're at the scene of the emergency. They don't do that. And I think I've used up my time. I still have a few minutes for Mr. Kaufman. If I may. Please record. My name is Alan Kaufman. I will address the offset issue, the credit issue. The basic issue is how you calculate the damages. The work week is at the core of the Fair Labor Standards Act. The work week is the standard for determining whether you're on overtime or not, and that's in Section 207. 207A requires that the employer pay overtime for hours worked over 40. The rest of 207 has certain rules for how you calculate what the employer owes to comply with this law. 207E has certain elements of compensation that are not required to be included in the computation of overtime. And then 207H says that those categories in 207E, certain categories in 207E, can be used to satisfy the employer's obligation for overtime in that work week. But we're dealing here, are we not, with an exemption from 207? Is that correct? And that exemption is found in 203Y? The exemption was improperly, the district court ruled that the city had improperly claimed the exemption. Isn't that the issue? The issue that brings us here today is whether or not these are exempt employees or not. And if they are exempt from 207, then why shouldn't I conclude that 207 really wasn't written with 24-hour shifts and a 27-day period in mind? It was written for the standard 8-hour per day, 5-day, 40-hour work week. But that's what the district court ruled they should have been paid. Well, we're on de novo review here, and I guess I'm asking you for help in the statutory interpretation because I have some doubt as to whether or not the statute applies in the manner in which you're arguing, if the exemption applies. Well, if the exemption applies, we don't even reach this issue. They were paid under the exemption. But the problem, as I understand it on the computation of damages, is that the district court treated the city as if it were an employer that should have been paying its employees on a standard 40-hour work week. Yes. And if they're exempt, then is that the correct analysis? Your Honor, the city claimed the exemption. The district court, the plaintiffs challenged that and said the plaintiffs should not have been exempt because they didn't satisfy 203Y. The district court agreed with us. Then the problem became, all right, how do we construct what they should have been paid? And that's the issue. I guess the question I'm really asking, and I think this is the city's argument, is why shouldn't the fairer way to compute the offset be to treat the employees the same way they were paid, that if they were paid for, say, 216 hours a month and they're entitled to overtime for everything over 204, why shouldn't the city get a credit for the difference between the hours that they actually worked and 204? Well, the statute, 207E and H, defines when you get a credit. And they did get a credit in this case. And I'll just say, parenthetically, the counsel misstated the amount of credit they got. They got credit for 40 hours in his example, but not for 20. It's not equal. Can you answer the number question for us? I don't know what the value is. You don't know what the answer is. And obviously, it's not in the papers. I don't know what the value difference is. But they get credit for some, most. In the example in the city's brief, they get credit for most of those hours under this methodology. They don't get credit for some. But by definition, that's what section 207H does. 207H says you only get credit. Unless these employees are exempt from 207. If the employees are exempt, you don't have this issue of how you credit, how you go back and reconstruct what they should have been paid. We only reach this issue, and that's why it's the last issue in the brief, if they're not exempt, if the district court was correct in ruling they're not exempt. Then we have to figure out what should you have paid them. And then the question is, you look at 207H, you get paid, and we can maintain, we believe it's the correct rule. You pay them what you should have paid them had you been complying with the law to begin with. And the reason for that is obvious. You don't want to place an employer who is not in compliance with the law in a better position than an employer who is complying with the law. As you go through, you apply the same exact rule. How would an employer who was paying the plaintiffs correctly have computed this credit? The way to compute the credit must be workweek by workweek. And the reason is stated in the cases that were summarized by a district court case from California that we forwarded to the court, the Stiller v. Costco case. Obviously, the issue arises because by using the workweek method to compute offset, some money, some compensation paid to employees in all those cases was not used for credit. That's why the issue arises. The question is, and in all those cases where the Sixth Circuit, Seventh Circuit, and all those district courts ruled that it should be workweek, some money was not used to credit. And the employer comes in and says, no, wait a minute. I want to get a credit for all my dollars that I use. This is not fair. There's a circuit split on this issue, is there not? There's not a circuit split, as the Stiller v. Costco case states. If you analyze the circuit cases that use a cumulative approach, which means that over the years at issue in the case, you look at how much excess overtime there was and apply it against the overtime liability. Those cases that purportedly hold that don't, in fact, hold that, as the Stiller v. Costco case analyzed. The Singer case from the Fifth Circuit exclusively ---- I read those cases, and with all due respect, is it a district court judge? Yes. And he or she may be right, but the way I read those circuit court cases, it looks to me like there is a circuit split, no matter how we rule on this issue, and that maybe the Supreme Court will tell us one of these days what the proper method of credit is. I'll put it this way, Your Honor. In the circuit petition, which I'm going to be sure to write in this case, I'm going to argue there's not a circuit court judge. I understand that, Mr. Kaufman. And that's still a case, I agree with the ---- The learned district judge. But in any event, let me move to the ultimate issue, which is what a cumulative offset does. If you have a cumulative offset, as opposed to a work-week-by-work-week offset, it completely turns the Fair Labor Standards Act upside down. And upside down to the point, as we have in our brief, it's conceivable that an employer would want to argue for three years a longer statute of limitations because there might be some offset money in a third year of liability that would be used to offset the overtime liability. You have other bizarre hypotheticals that you could ---- So is your argument that an employer in that case, having acted in bad faith, would essentially remove the sting of the monetary penalties if the city's view pervades? There may be cases, even if you go to a cumulative approach over the entire statute of limitations, you may have cases where the employer, the employee has a claim when he first comes into court and wasn't paid overtime on a work-week basis, only to find out when the case is decided years later that the employer, that they don't have a claim anymore in that work week because two years later, there was some premium pay paid, and I'm sorry, you had a claim when you first came in, but you don't have it now. A cumulative approach would require the employee to keep some kind of running tab as to when he's in plus or minus and then only run into court when he's in the plus, only to find out after he's litigated he's in the minus. It's completely unworkable. And the Sixth, Seventh Circuit cases, the district court, the weight of authority says so. The work-week basis is at the core of the Failure to Standards Act. How is an employer supposed to know what to pay an employer who's complying with the law? They have to compute it on a work-week basis. How is an employee supposed to know when to go into court? It must be on a work-week basis. The credits have to be work-week. There is no other way to administer the statute in a coherent fashion. It must be work-week. The Sixth, Seventh Circuit cases found that. Now, the Fifth Circuit specifically said it was not a 207-H decision. In that case, the Fifth Circuit said the payments were prepayments. But there's a significant fact in Singer as to why it doesn't control in this case. The Singer court, the Fifth Circuit said this is not a 207-H decision, and the reason is if you are claiming 207-H under 207-E, those 207-E payments are not included in the regular rate. And that's the case in this case. We stipulated that the payments at issue are 207-E payments, and therefore, it's governed by 207-H. In Singer, the payments at issue were not 207-E. They were included in the regular rate. Well, that takes care of Singer and the Fifth Circuit, but what about the Colhan case in the Eleventh? The Colhan language does not discuss offset. It just is some very general language about all the distinction that Colhan was making. And again, this is, I agree with the Stiller case in the way they describe Colhan. It just talks about a distinction between some premiums were allowed to be offset as opposed to all premiums. But it did not specifically discuss 207-H or whether it should be on a cumulative basis or a work-rate basis. And so the only authority, and certainly the weight of authority, is the Sixth, Seventh Circuit cases, which lay out the reasons why it must be work-rate by work-rate. Now, the fact that some money is not, as a result of using work-rate by work-rate, that some dollars paid by the city are not creditable against the overtime, that's by definition what the statute does. It says only these payments. So that's not a reason to come to court and say this is unfair. This is what Congress decided. And in every one of those cases, the precedents, the employer, some of those monies were not used as a credit. Now, what the city says in terms of distinguishing those cases is that this case is different because of the nature of the payments that were made or the fact that it was a misclassification case. But there is no support in the law for that. There is no difference as to what the violation was. The violation here was they didn't pay overtime that they were supposed to pay. And the law doesn't draw a distinction. What the city is really asking for is a special rule. It just so happens the facts of their case happen to fit within an exception that this Court should create just for them. Even though every other employer who has come to this Court arguing it's not fair has, you know, in the Sixth and Seventh Circuit and the other district court cases we cite, they have lost the case. And do you have any understanding at all or estimate of what's at stake here in applying one rule or the other in this case? We don't know the dollar amounts. But what I will say is that for this Court creating an appellate rule, if you were to announce a cumulative rule, it would turn the Fair Labor Standards Act upside down. It would create an incentive for an employer not to pay overtime on an ongoing basis, because why not wait to be sued, see what the cumulative total is at some time in the future. Are you going to pay premiums in the future? Then they'd face liquidated damages. No, because this is an offset. Oh, I see. Against the overtime itself. I see. Reduce the damages and therefore double a very small number is still a small number. Exactly. Or eliminate it. Again, you could find yourself in one year having an overtime claim on a workweek basis, come into court, then work a lot of this premium overtime, only to find by the time of litigation. Now, not only is that wrong claim under the statute, but it's wrong for the courts. You have a whole bunch of cases, litigate them and only find out when you calculate damages. Oh, no, never mind. We wasted all this time to litigate this issue when there were no damages because we offset on some cumulative basis. There are other reasons why the cumulative basis doesn't make any sense that we lay out in the brief. And the pay period basis suffers from the same problem as the cumulative basis. It's just the same conceptual problem, because pay period, the pay period in this case was two weeks. But a pay period can be however long the employer says. So the employer can create a pay period of once a year, and that employer could use a cumulative one year offset, whereas an employer using two weeks would have a two week offset. And it's the same. It causes the same difficulties as a cumulative offset. So your answer is that the proper way is to make this determination on a week by week basis. That's the only way that the Fair Labor Standards Act coheres in terms of its enforcement, in terms of the employer's ability to comply, in terms of the employee's ability to know whether the employer has complied. It's the only way the Fair Labor Standards Act hangs together as the Sixth and Seventh Circuit has concluded and the other district has. And those would be the reasonable expectation of an employee. The employee has to know, has to look at his paycheck and say, well, did I work any offsetting overtime in that work week? Am I getting paid the right amount? As opposed to in a cumulative system, you would say, well, I don't know. I don't know if I got the right amount, because next year I might work some premium offset. Or it might be that last year I worked it, but I just didn't keep my running tally. I don't know if this week I worked it. So is that why the union never raised this issue in contract negotiations with the city? Because nobody realized that there was an obligation on the part of the city to have to pay more? I have no information about what the union did or didn't do or why. But we know that the issue never came up in contract negotiations. Well, the offset issue, again, only arises after. I'm not talking about the offset issue. I'm just talking about the obligation to pay. The obligation to pay overtime on a 40-hour work basis? Right. Again, I have no information as to what. Well, there's nothing in the record that says that was ever discussed with the city. The union, as I recall, there are some stipulations that talk about the union. Raising the issue. But obviously in the Fair Labor Standards Act, enforcement is by individuals. And again, I have no information as to why the union did or didn't decide to proceed in some other fashion. I was just wondering, based on your last answer, if that was why it never came up. Because nobody, none of the union members realized there was an issue there. Because you're representing people who are employed by the union or who are represented by the union. Yes. But when you say it was the issue, meaning the exemption issue? Yes. Whether they realized it or not, apparently they did realize it. But whether they realized it or not and decided to sue is a two-separate question. Right. But I guess that goes to the city's evidence of either good faith or willfulness. Right. We claim the stipulated facts show a long history of the city. You know, not necessarily this issue per se. The dispatcher issue was raised, I believe. I raised it. Again, it's not in the record, but we raised it in 2006, I think, specifically. After Cleveland. Yeah. Cleveland showed them the path. We claim under this circuit's precedence both of those. And the federal labor law requires you compute over time on a weekly basis. Am I right about that? Yes, but going to the question of liability and willfulness. This circuit's precedence required the employer to actively monitor its employees and determine whether I'm in compliance. And if the dispatchers are so significant and so closely related to the paramedics, as the defense seems to say, you would think that after Cleveland they would have taken a look. Hey, wait a minute. Under Cleveland, what about these dispatchers over here? Maybe, you know, there are four floors under City Hall. In Cleveland also there were these quality assurance representatives who sat at desks. And those were plaintiffs, prevailing plaintiffs in that case. And the city did not appeal as to those plaintiffs. They sat at desks performing desk work. So you would certainly think that under Cleveland the city would take notice and say, well, wait a minute. We didn't appeal the quality assurance reps. The paramedics who do go to the fire scene were found to not have the responsibility to engage the fire scene. Why don't we take a look at these dispatchers and the city stipulated that they did not? They could have sent them. They could have made a request to the Department of Labor. They had done those in other contexts. It's all in the stipulated fact. They knew how to do those things, and they just did nothing with respect to dispatchers. And that's why we claim this clear record of willfulness here. Thank you. Thank you. Do I have any time left, Your Honor? No, it says a minute. If I could just address the issue on the credits and the concerns raised by counsel about an employer devising some sort of nefarious scheme to manipulate overtime payments, while I'm not going to dispute that as a possibility, that's not what happened here. And what happened here was there were systematic overtime payments being made every 27 days, and all the city is trying to do here is get credit for those payments that were intended to satisfy all of their FLSA overtime obligations. The city fell short. What does federal labor law require? You pay overtime on a weekly basis? If they're not exempt, yes, you pay overtime after 40 hours in a 7-day week. But this is the city paid that overtime every 27 days. The city, depending on how the court rules, thought that they were exempt and thought they were paying them for all FLSA overtime, and this wasn't some kind of scheme where the city was trying to cheat them out of overtime or anything like that, which that type of concern that Mr. Kaufman raised could be an issue under other circumstances, but not the facts of this case. But under the way the district court fashioned the remedy, am I correct in thinking that the city will still get credit if you go back and you measure it on a week-by-week basis for any times where the city paid, you know, more than it should have, that will be credited against any obligations that may be owed, right? Not exactly, because let's say that the city had paid 48 hours of overtime to the firefighters, and that 48 hours of overtime is allocated to two shifts in a week. Well, that week, when you do a work-week-by-work week, that firefighter only worked 48 hours. So under the weekly standard, that's eight hours of overtime. And so the city paid 48 hours. The city gets credit for eight hours of overtime. That 40 hours of overtime, the 40 other hours disappears. And that's the concern that we're raising in this situation with the offsets. Well, you know, the city is supposed to get overtime on a weekly basis, okay? And then the city could look at how this is accumulating for an employee and then have him not work on a particular week at 40 hours, have him work a lot less than 40 hours, right? So now you have him work 40 hours. You've worked less than 40 hours. So we're going to get credit when we compute this on a 27-day basis. Well, the city in that case would get credit for overtime it had paid. So I'm not sure I understand. If you do it on a week-to-week basis, if you do it on a week-to-week basis, and the employee knows how many hours they work, they know what their paycheck is going to be, right? That's correct. That's right. Okay. You do it on a 27-day basis. You're not doing it on a week-to-week basis. That's correct. Okay. You're supposed to do it on a week-to-week basis. Well, depending on how the court rules here, that may or may not be the case. Isn't that what the labor code requires? If they're non-exempt, yes. If they're non-age and fire suppression. So if your preferred method is adopted, would you take the total amount of overtime that was paid to that employee during the 27-day period, then go back and look at each week in that 27-day period and determine whether there was any overtime worked in a particular week and subtract from whatever the total is for the almost four-week period, the amount that was paid versus the amount of overtime that was worked, and the difference would be what the city would have to pay now? That's correct. And that's not what the district court did. The district court said, no, I'm not going to give you any offset at all. You're going to have to pay as if you had not paid overtime at all for all the overtime in each week worked. We got a little bit. The city got some offset. The city got offset. It's a percentage. It's not 100%. As I mentioned earlier, I think the city maybe got 60% or 70% credit on the overtime. But what the district court did is it looked at every single hour worked, and it allocated overtime. It took the 27-day period and looked at each shift that the firefighter worked, and it worked backwards from the end of the 27-day period. And they worked 24-hour shifts. So the last 24-hour shift worked was credited with 24 hours of overtime. The next to last 24-hour shift, another 24 hours of overtime, until they ran out of overtime based on what the city had paid. And the problem with that approach is those 24-hour shifts, they may not have been FLSA overtime hours. In other words, and if they were not treated as FLSA overtime, the overtime the city paid just vanished. So the hours, if any of that overtime for the 27-day period was allocated to an hour work that was under 40 in a week, the pay vanished. And that's the credit we're trying to get back if there are damages. How many employees are the plaintiffs in these cases, these various cases? This is not class action, correct? No, it's not. So how many plaintiffs are we talking about? There are 75 dispatchers in five or six areas. I think one person was both a dispatcher and a New York ambulance. So I think there's 80 total. Thank you. Thank you. Is there anything new that you want to address? Okay. Because that's not an easy subject. Makes my head. Okay. Thank you. Thank you. This session, the court is adjourned.
judges: Simon, Pregerson, Tallman